## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **JOHN D. FIERRO** ) | |
| **and** ) | **Jury Trial Demanded** |
| **JDF CAPITAL, INC.,** ) | |
| ) | |
| **Defendants.** ) | **No. 20-cv-2104** |
| ) | |
| ) | |
| ) | |

## COMPLAINT

Plaintiff, Securities and Exchange Commission (the "SEC"), alleges as follows:

## I.   SUMMARY

1.      From at least January 2015 through November 2017 ("the Relevant Period"), John D. Fierro and his wholly-owned and controlled company JDF Capital, Inc. ("JDF") (collectively "Defendants") bought and sold billions of newly issued shares of microcap securities (*i.e.*, penny stocks)—and generated millions of dollars from those sales—but failed to comply with the mandatory dealer registration requirements of the Federal securities laws.

2.      Defendants' admitted business model is to buy convertible notes—a type of security—from penny stock issuers, convert the notes into newly issued shares of stock, and sell those shares into the public market at a profit.  During the Relevant Period, Defendants purchased or converted more than 50 such notes from more than 20 different microcap issuers.  Defendants demanded and received highly favorable terms for these notes, including deep discounts from the

prevailing market price.  By engaging in a regular business of buying convertible notes and selling the resulting newly issued shares of microcap stock into the public market, Defendants operated as unregistered securities dealers and generated more than $2.3 million in profits.

3.      By failing to comply with the dealer registration requirements of the Federal securities laws, Defendants avoided certain regulatory obligations for dealers that govern their conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules, and maintaining books and records.

4.      Through these activities, Fierro and JDF violated Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") by acting as unregistered securities dealers.  [*See* 15 U.S.C. § 78o(a)(1)]  Additionally and alternatively, Fierro is a controlling person of JDF Capital, Inc., under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)], and Fierro is therefore liable for JDF's violations of Exchange Act Section 15(a)(1).  The SEC requests, among other things, that this Court enjoin Defendants from committing further violations of the Federal securities laws as alleged in this Complaint, and order them to pay disgorgement and a monetary penalty based upon these violations.

## II.     DEFENDANTS AND RELATED INDIVIDUAL

5.      **John D. Fierro**, age 44, resides in Freehold, New Jersey.  He is the President of JDF Capital, Inc., and he controls all aspects of the corporation, including its business plan and all transactions involving penny stock issuers and the purchase and sale of their securities.  Fierro is not registered in any capacity with the SEC and does not hold any industry licenses.

6.      **JDF Capital, Inc.** is a corporation formed in 2009 under the laws of New York, with its principal place of business in Freehold, New Jersey.  JDF is wholly-owned, controlled,

and operated by Fierro and it conducts all or part of its activities in the District of New Jersey.

Fierro has received all of the profits JDF generated during the Relevant Period.

7.     **Mark Allen Lefkowitz**, age 51, resides in Colts Neck, New Jersey.  Lefkowitz is

Fierro's brother-in-law, and he engaged in various activities related to JDF's business, including

assisting Defendants in acquiring convertible notes from penny stock issuers, determining when to

convert the notes, and urging note issuers to make required SEC filings.  Lefkowitz is a Federal

securities laws recidivist.  Most recently, he pleaded guilty in Federal court in 2015 to conspiracy

to commit securities fraud, and he received a 10-month prison sentence and a restitution order of

$835,500.  In 2009, the SEC barred Lefkowitz from associating with any broker or dealer for

violating the antifraud and broker-dealer registration provisions of the Federal securities laws.  In

2004, the National Association of Securities Dealers (now known as the Financial Regulatory

Authority or FINRA) barred Lefkowitz from associating with any member firm in any capacity.

## III.    JURISDICTION AND VENUE

8.     This Court possesses jurisdiction over this matter pursuant to Exchange Act

Sections 21(d), 21(e), and 27.  [*See* 15 U.S.C. §§ 78u(d), 78u(e), and 78aa]  In connection with the

transactions and acts alleged in this Complaint, Defendants, directly or indirectly, made use of the

means and instrumentalities of transportation and communication in interstate commerce and of

the mails.

9.     Venue lies in the District of New Jersey pursuant to Exchange Act Section 27 [15

U.S.C. § 78aa] because Fierro resides in and conducts business through his company, JDF, in this

District.  Most of the transactions and acts constituting the violations alleged in this Complaint

occurred in this District.  For instance, during the Relevant Period, Fierro, acting through JDF, in

this District: solicited penny stock issuers to sell him convertible notes, negotiated purchase and

sale terms for the notes, purchased the notes, converted the notes to penny stock, and placed orders to execute sales of the converted stock.

IV.     **FACTS**

      A.     **Defendants Bought Convertible Notes From Penny Stock Issuers, Converted Them to Newly Issued Shares of Stock, and Sold the Shares in the Market as Part of Their Regular Business.**

      10.     Defendants are operating a business in New Jersey, through which they buy convertible notes, a form of short-term debt security, from penny stock issuers in need of cash. After holding the notes for approximately six months, Defendants convert them into newly issued shares of stock at deeply discounted prices—which they negotiate in advance of the purchase— and sell that stock into the market at a profit.  During the Relevant Period, Defendants bought convertible notes from more than 20 penny stock issuers and sold almost 6.5 billion newly issued shares of the issuers' stock into the public market.  Defendants' profits from this practice were more than $2.3 million, the vast majority of which came from the spread between their discounted acquisition cost for the stock and the prevailing market price.

      11.     Fierro personally negotiated the terms of the convertible notes that JDF purchased from penny stock issuers (as well as amendments to the original terms).  As a result of Fierro's negotiations, Defendants generally received very favorable terms from the issuers.  On behalf of JDF, Fierro signed the securities purchase agreements by which JDF acquired the convertible notes.

      12.     During the Relevant Period, Defendants held themselves out to the public as being willing to buy convertible notes at a regular place of business, which is located in Freehold, New Jersey.  Fierro operated a website for JDF that advertised its business to issuers using the Freehold, New Jersey address.  On behalf of JDF, Fierro hired independent contractors, who

4

worked on commission, to solicit issuers who were willing to sell convertible notes to JDF.  Fierro and others associated with JDF also attended, and sometimes sponsored, conferences at which they solicited penny stock issuers in person.  Fierro personally supervised all of JDF's independent contractors who were working to locate issuers who were willing to sell convertible notes to JDF.

13.    Defendants obtained nearly all of the stock that they sold in their business directly from the issuers, through note conversions and not from purchases in the secondary market.  The shares were newly issued, and the sales of the shares in the market significantly increased both the amount of shares in the hands of the public and the issuers' outstanding unrestricted share totals.  Selling large quantities of newly issued shares into the market is a common attribute of a securities dealer.

14.    The newly issued stock that Defendants received through the conversion process was restricted.  SEC Rule 144 enables non-affiliates to acquire restricted stock directly from the issuer in a private transaction and to resell it into the market after observing a holding period, among other requirements.  [*See* 17 C.F.R. § 210.144]  Defendants timed their conversions and sales in an effort to comply with the holding period under Rule 144.  For that reason, Fierro generally waited six months after purchasing a convertible note before he began to exercise JDF's right to convert the note to stock, which he then resold in the market.  Fierro submitted the conversion notices to the issuers himself or through employees of JDF who acted at Fierro's direction (using mail, facsimile, and/or email facilities).  Fierro also personally, or through JDF employees acting at his direction, arranged for the converted stock to be transferred to JDF's brokerage accounts either electronically or via mailed certificates.  As part of this process, Fierro obtained attorney opinion letters to assure JDF's brokerage firms that the converted stock was no

longer restricted and could be resold to the public.  Fierro and the other employees of JDF performed this work at JDF's office in Freehold, New Jersey.

15.     The convertible notes that JDF bought from the issuers entitled Defendants to receive issuer stock at a substantial discount from the prevailing market price.  Each note provided for a specified discount, which generally ranged between 35 and 50 percent less than the lowest closing price for the stock during the 10 to 25 trading days preceding the conversion request. Fierro, who was authorized to trade in JDF's accounts, generally sold the stock immediately after conversion himself, or through an employee acting under his supervision, and thereby locked in his gains.  Fierro and an employee used the telephone, email, and text messages to place these sell orders.  The vast majority of Defendants' profits resulted from the discounted prices at which they acquired shares from the issuers to sell into the market.  This mechanism, which gave Defendants a spread (or markup) on the stock that they sold, is a common attribute of a securities dealer.

16.     Defendants' practice was to convert notes in tranches, selling the resulting shares into the public market before converting a new tranche.  Defendants normally profited even when their tranched selling (or other factors) depressed the market price for a particular issuer's stock. This was because they could convert a new tranche at a discount to the diminished market price. This mechanism helped to protect Defendants' profits if the market price of a stock declined, as it often did.

17.     Defendants' dealer business was very lucrative.  The following are examples of transactions in which Defendants purchased convertible notes from penny stock issuers, exercised JDF's discounted conversion rights, and sold the resulting newly issued stock into the market for a significant profit:

a.      5BARz International, Inc. ("BARZ")

    i      On March 2, 2015, JDF purchased, via telephone and email, a convertible note from BARZ for $175,000.

    ii      Pursuant to the terms of the note, JDF elected to convert $211,750 of the principal, interest, and "original issue discount" ("OID") that BARZ owed JDF under the note into shares of BARZ stock on September 21, 2015.  In so doing, JDF received a total of 4,343,589 newly issued shares.

    iii      Pursuant to the favorable terms that Fierro negotiated for JDF, the conversion price for these shares was 35 percent less than the lowest closing price for the stock in the 25 trading days preceding each conversion.  The terms Fierro negotiated allowed JDF to spend significantly less money to acquire the shares than it would have paid on the open market.

    iv      Defendants sold the shares in November 2015 and May-June 2016, generating profits of $73,469, all of which were attributable to the discounted acquisition prices that Fierro negotiated.

b.      Pocket Games, Inc. ("PKGM")

    i      On May 8, 2015, JDF purchased, via telephone and email, a convertible note from PKGM for $100,000.

    ii      Pursuant to the terms of the note, Fierro elected to convert $118,000 of the principal, interest, and OID that PKGM owed to JDF under the note

7

into shares of PKGM's stock on 24 occasions between November 9, 2015 and February 23, 2017.  In so doing, JDF received a total of 254,539,000 newly issued shares.

iii  Pursuant to the favorable terms that Fierro negotiated for JDF, the conversion price for these shares was between 40 and 42 percent less than the average of the three lowest closing prices for the stock in the 10 to 25 trading days preceding each conversion.  The terms Fierro negotiated allowed JDF to spend significantly less money to acquire the shares than it would have paid on the open market.

iv  Fierro sold the shares into the public market from JDF's accounts shortly after each conversion, generating profits of $144,554, most of which were attributable to the discounted acquisition prices that Fierro negotiated.

c.  Sparta Commercial Services, Inc. ("SRCO")

i  On August 25, 2014, January 26, 2015, and July 8, 2015, JDF purchased, via telephone and email, three convertible notes from SRCO, paying $100,000 for the first two notes and $75,000 for the third note.

ii  Pursuant to the terms of the notes, Fierro elected to convert $165,937 of the principal, interest, and OID that SRCO owed to JDF under the notes into shares of SRCO stock on 12 occasions between February 25, 2015 and June 3, 2016.  In so doing, JDF received a total of 25,543,262 newly issued shares.

8

iii     Pursuant to the favorable terms that Fierro negotiated for JDF, the conversion price for these shares was 40 to 48 percent less than the lowest closing price for the stock in the 20 trading days preceding each conversion. The terms Fierro negotiated allowed JDF to spend significantly less money to acquire the shares than it would have paid on the open market.

iv     Fierro sold the shares into the public market from JDF's accounts shortly after each conversion, generating profits of $89,137, all of which were attributable to the discounted acquisition prices that Fierro negotiated.

d.     Solar Wind Energy Tower, Inc. ("SWET")

i     On June 3, 2014 and May 15, 2015, JDF purchased, via telephone and email, two convertible notes from SWET for $800,000 and $50,000.

ii     Pursuant to the terms of the notes, Fierro elected to convert $542,996 of the principal, interest, and OID that SWET owed to JDF under the notes into shares of SWET's stock on 32 occasions between January 21, 2015 and April 11, 2016. In so doing, JDF received a total of almost 1.4 billion newly issued shares.

iii     Pursuant to the favorable terms that Fierro negotiated for JDF, the conversion price for these shares was 42 percent less than the lowest closing price for the stock in the 15 to 25 trading days preceding each conversion. The terms Fierro negotiated allowed JDF to spend

significantly less money to acquire the shares than it would have paid on the open market.

iv    Fierro sold the shares into the public market from JDF's accounts shortly after each conversion, generating profits of $340,087, all of which were attributable to the discounted acquisition prices that Fierro negotiated.

18.    For the ten highest grossing stocks between January 2015 and November 2017, Defendants converted $3,069,981 of principal, interest, and OID due under the notes into discounted shares of newly issued stock and they sold approximately 5.7 billion shares into the market.  Defendants reaped gross proceeds of $5,395,076 and gains of $2,325,095.

19.    In running JDF, Fierro enlisted the help of his brother-in-law, Mark Lefkowitz. Fierro allowed Lefkowitz to act as a "consultant" for JDF.  In that role, among other duties, Lefkowitz participated in JDF's negotiations to buy convertible notes from penny stock issuers. He also advised Fierro and JDF's employees about how to administer the company's convertible notes, providing input about when to convert them.  Lefkowitz contacted issuers of convertible notes held by JDF via telephone and email to inquire about their SEC filing status.  This was because JDF could not resell converted stock if the issuers were delinquent in their required periodic filings.  Lefkowitz also infused $500,000 into JDF, purportedly as a loan, which JDF used for its business operations.  If Fierro and/or JDF had registered as dealers, it is unlikely that they would have been permitted to associate with Mark Lefkowitz because the SEC barred him from associating with a broker-dealer in 2009.

**B.     JDF and Fierro Violated the Federal Securities Laws by Acting as Unregistered Dealers.**

20.     Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC or, in the case of a natural person, associate with a registered dealer.  [15 U.S.C. § 78o(a)(1)]

21.     Defendants JDF and Fierro used means or instrumentalities of interstate commerce to buy and sell securities as part of their regular business.  For example, JDF and Fierro used the Internet to solicit microcap issuers, transferred cash through bank wires, and used the telephone to negotiate and conduct sales transactions.  JDF and Fierro engaged in much of the conduct described in this Complaint at JDF's headquarters or elsewhere in this District.

22.     Between January 2015 and November 2017, neither JDF nor its owner Fierro was registered with the SEC as a dealer.

23.     Between January 2015 and November 2017, Fierro was not associated with a dealer registered with the SEC.

24.     Registration with the SEC requires the dealer to provide important information to the SEC about its business—some of which is made public—including but not limited to the names of the direct and indirect owners and executive officers of the business, certain arrangements with other persons or entities, the identities of those who control the business, the states in which the dealer does business, past criminal or regulatory actions of the dealer or any affiliate that controls the business, and financial information, including bankruptcy history. Further, registration requires the dealer to join a self-regulatory organization, such as FINRA or a national security exchange, which assist the SEC in regulating the activities of registered dealers.

Finally, registered dealers are subject to inspection by the SEC and FINRA to ensure that they comply with the securities laws.

### C.       JDF and Fierro Sold Penny Stock.

25.     JDF and Fierro sold stock that did not meet any of the exceptions from the definition of a "penny stock," as defined by Exchange Act Section 3(a)(51) and Exchange Act Rule 3a51–1.  [*See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51–1]

26.     JDF and Fierro therefore participated in the offering of penny stock by acting as securities dealers engaged in the selling of penny stock.

### COUNT I
### Violation of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]
### *(Against JDF and Fierro)*

27.     The SEC re-alleges and incorporates by reference each and every allegation in paragraphs 1-26, inclusive, as if they were fully set forth herein.

28.     By engaging in the conduct described above, Defendants JDF and Fierro made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, or to induce or to attempt to induce the purchase or sale of, securities as part of a regular business while not registered with the SEC as dealers and while Fierro was not associated with an entity registered with the SEC as a dealer.

29.     By reason of the foregoing, Defendants JDF and Fierro violated Exchange Act Section 15(a)(1).  [*See* 15 U.S.C. § 78o(a)(1)]

30.     A violation of Section 15(a)(1) does not require proof of scienter.

## COUNT II

## Violation, as a Control Person, of Exchange Act Section 15(a)(1) [15 U.S.C. § 78t(a)]
### (*Against Fierro*)

31.    The SEC re-alleges and incorporates by reference each and every allegation in paragraphs 1-30, inclusive, as if they were fully set forth herein.

32.    During the Relevant Period, Defendant Fierro was the sole person who owned and controlled JDF Capital, Inc.

33.    Under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)], every person who, directly or indirectly, controls any entity liable under any provision of the Exchange Act or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled entity to any person to whom such controlled person is liable (including the SEC), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

34.    Fierro did not act in good faith, and he directly induced the acts constituting JDF Capital, Inc.'s violations of the Exchange Act.

35.    By reason of the foregoing, Fierro is jointly and severally liable for JDF's violations of Exchange Act Section 15(a)(1) through his control of JDF Capital, Inc.

## RELIEF REQUESTED

WHEREFORE, the SEC respectfully requests that this Court issue a Final Judgment:

# I.

## Violations

Finding that Defendants each violated the Federal securities laws and rules promulgated thereunder as alleged against them in this Complaint.

# II.

## Permanent Injunction

Permanently restraining and enjoining Defendants and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive notice of the injunction by personal service or otherwise, from acting as unregistered securities dealers in violation of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)(1)].

# III.

## Penny Stock Bar

Permanently restraining and enjoining Defendants from participating in the offering of any penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)].

# IV.

## Civil Penalties

Ordering Defendants to pay an appropriate civil penalty under Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)].

## V.

### Disgorgement

Ordering Defendants, jointly and severally, to disgorge, with prejudgment interest, all ill-gotten gains derived from the activities set forth in this Complaint.

## VI.

### Further Relief

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the Federal securities laws and for the protection of investors.


DATED:    February 26, 2020                 Respectfully submitted,

                                  By:

                                                     /s/

Joshua E. Braunstein
Antony Richard Petrilla
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington DC 20549
Telephone: (202) 551-8470
Braunsteinj@sec.gov

**Lead Attorney**
**Attorney To Be Noticed**

**ATTORNEY FOR PLAINTIFF**
**SECURITIES AND EXCHANGE COMMISSION**

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other civil action pending in any court, or of any pending arbitration or administrative proceedings.

Dated: February 26, 2020

_____/s/_____
Joshua E. Braunstein
Antony Richard Petrilla
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
100 F Street NE
Washington DC 20549
Telephone: (202) 551-8470
Braunsteinj@sec.gov

**DESIGNATION PURSUANT TO LOCAL CIVIL RULE 101.l(f)**

Pursuant to Local Civil Rule 101.1(f), because the Securities and Exchange Commission ("SEC") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as an eligible alternative to the SEC to receive service of all notices or papers in the action at the following address:

> David Dauenheimer
> Deputy Chief, Government Fraud Unit
> Assistant U.S. Attorney
> 970 Broad Street
> Newark, New Jersey 07102
> Email: david.dauenheimer@usdoj.gov
> (973) 645-2700

Dated: February 26, 2020

> _____/s/_____
> Joshua E. Braunstein
> Antony Richard Petrilla
> Attorneys for Plaintiff
> SECURITIES AND EXCHANGE
> COMMISSION
> 100 F Street NE
> Washington DC 20549
> Telephone: (202) 551-8470
> Braunsteinj@sec.gov