**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>JOHN D. FIERRO, *et al.*,<br><br>     Defendants. | Civ. Action No. 20-02104 (GC)<br><br>**OPINION** |

**CASTNER, District Judge:**

This matter comes before the Court on cross motions for summary judgment, respectively filed by Defendants John D. Fierro ("Fierro") and JDF Capital, Inc. ("JDF") (collectively, "Defendants") and Plaintiff Securities and Exchange Commission (the "SEC"). (ECF Nos. 30, 31.) Separately, Defendants also bring a Motion *in Limine* with respect to evidence related to the SEC's pursuit of a disgorgement remedy. (ECF No. 29.) The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons stated herein, the SEC's Motion for Summary Judgment is **GRANTED**; Defendants' Motion for Summary Judgment and Motion *in Limine* are **DENIED**.

## I.  BACKGROUND AND PROCEDURAL HISTORY

In this civil action, the SEC charges Defendants with acting as unregistered securities dealers in violation of Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78o(a)(1). (*See* Compl. ¶ 4, ECF No. 1.) The SEC further charges that Fierro is a

control person of JDF under Exchange Act Section 20(a), 15 U.S.C. § 78t(a), and that Fierro is, therefore, liable for JDF's violations of Section 15(a)(1). (*See id.*) The undisputed factual circumstances giving rise to this lawsuit, as revealed through discovery, are set forth in the submissions of the parties in accordance with Local Civil Rule 56.1. (*See* Defendants' Statement of Material Facts ("Defs.' SOMF"), ECF No. 30-1; SEC Statement of Material Facts ("SEC SOMF"), ECF No. 31-2.)

### A. The Convertible Notes

Fierro, a New Jersey resident, is the President and sole owner of JDF, a New York corporation, which maintains an office located in Freehold, New Jersey. (SEC SOMF ¶¶ 3–5.) JDF's business consists of buying and selling securities for its own account. (*Id.* ¶ 10, Ex. 1 at 123:10–15.) From January 2015 through November 2017 (the "Relevant Period"), Defendants purchased securities called convertible notes from penny stock issuers. (*Id.* ¶ 11.) After a brief holding period, Defendants would convert the notes to stock at a discounted rate and then sell the stock for a profit. (*Id.* ¶¶ 14–24.) Neither Fierro nor JDF registered with the SEC as a securities dealer or associated with a registered dealer during the Relevant Period. (*Id.* ¶ 6.)

To assist its convertible notes activities, JDF employed one employee, Donna Principe, who later became a consultant for the company. (*Id.* ¶ 7, Ex. 1 at 44:3–7, 45:17–23.) Principe's duties included processing paperwork for convertible notes, conversion of the notes, and placing orders to sell stock from the converted notes. (*Id.* ¶ 8, Ex. 1 at 49:9–15, Ex. 4 at 28:17–19.) In addition, JDF also paid independent contractors, including Marshall Pickett, Robert Fierro (Fierro's nephew), and Will Arzenis, to solicit issuers to sell it convertible notes (*Id.* ¶ 9.)

The convertible notes that Defendants purchased were mostly issued by early-stage microcap companies with limited sources of capital. (*See* Defs.' SOMF ¶ 7.) Fierro negotiated the

terms of the convertible notes and signed contracts with the issuers to memorialize the terms. (*See* SEC SOMF ¶ 12.) In general, the note issuers promised to pay JDF a designated sum of principal and interest within a certain time frame.[1] (*Id.* ¶ 13, Exs. 6–8.) The notes also contained an original issue discount ("OID"), which was a fee equal to approximately 10% of the face value of the note that issuer was required to pay to JDF. (*Id.* ¶ 14, Ex. 6 at § 1.2, Ex. 7 at § 1.3.) As the holder of the notes, JDF retained the option to demand that the sums owed under the notes be paid in the form of the issuer's stock, known as "converting the notes." (*Id.* ¶ 15.) It was Defendants' practice to hold the convertible notes for at least six months before converting them, in order to comply with SEC Rule 144, which creates a procedure for selling otherwise restricted securities. (*Id.* ¶ 16.) Defendants converted notes by submitting written conversion notices, signed by Fierro, to the issuer of the note or its transfer agent.[2] (*Id.* ¶ 17, Ex. 9.) Upon conversion, Defendants received issuer stock at a substantial discount from the market price, which typically ranged between 35% and 50% less than the lowest closing price for the stock during the 10 to 25 trading days preceding the conversion request.[3] (*Id.* ¶¶ 20–21.) JDF deposited the stock converted from the notes into one of its 15 brokerage accounts. (*Id.* ¶ 22.) Fierro, or an employee acting under his supervision, then quickly sold the stock to lock in any gains. (*Id.* ¶ 24.) As such, the conversions operated as the main profit source for JDF during the Relevant Period. (*Id.* ¶¶ 18–19.)

When evaluating whether to purchase convertible notes from certain issuers, Defendants

---

[1] Issuers of exemplary convertible notes in the record include: 5BARz International Inc.; Pocket Games, Inc.; and Sparta Commercial Services, Inc. (*See* SEC SOMF ¶ 13, Exs. 6–8.)

[2] The record includes exemplary, executed conversion notices, signed by Fierro, for the stock of Solar Wind Energy Tower, Inc. (*See* SEC SOMF ¶ 17, Ex. 9.)

[3] The convertible notes capped conversions to ensure that Defendants did not own 5% or 10% of the issuer's stock at any point in time to avoid triggering certain SEC filing requirements for insiders. (*See* SEC SOMF ¶ 23.)

considered a range of factors, including the liquidity of the issuer's existing stock, the volume at which it traded in the market, and the issuer's other outstanding convertible debt.[4] (*Id.* ¶ 26.) In addition to the convertible notes, some issuers also sold Defendants warrants, which were similarly convertible into issuer stock. (*Id.* ¶ 28, Ex. 4 at 152:9, Ex. 13.)

### B.    Defendants' Profits and Promotional Activities

During the Relevant Period, Defendants purchased convertible notes from more than 20 different penny stock issuers, converted those notes into stock, and sold nearly 6.5 billion newly issued shares into the public market. (*See* SEC SOMF ¶¶ 29–30.) Fierro and a JDF employee under his supervision used telephone, email, and text messages to place orders to sell stock from the converted notes. (*Id.* ¶ 35.) The stock that Defendants converted and sold was newly issued by the relevant companies, as Defendants obtained nearly all the stock they sold directly from the issuers, through note conversions, and not from purchases in the secondary market. (*Id.* ¶ 37, Ex. 4 at 123:13–14.) With respect to the ten highest grossing stocks in the Relevant Period, Defendants converted $3,069,981 of principal, interest, and OID due under the convertible notes into discounted shares of newly issued stock, and ultimately sold approximately 5.7 billion shares into the public market. (*Id.* ¶ 31.) Defendants' gross proceeds from the sales amounted to $5,395,076 and gains of $2,325,095. (*Id.* ¶ 32.)

For marketing and publicity purposes, JDF maintained a website, jdfcap.com. (*Id.* ¶ 39, Ex. 11.) Fierro paid a web designer and writer to create the website and its content, and Fierro approved all the content that appeared on the site. (*Id.* ¶¶ 40–42, Ex. 14 at ¶¶ 7, 9.) The website stated that JDF provided "Direct Capital Investment," described as: "We structure transactions that are both

---

[4] As set forth *infra*, Defendants' website lists a range of questions for potential convertible notes issuers to answer. (*See* SEC SOMF ¶ 26, Ex. 11.)

equity and convertible into equity to help finance growth. We have closed convertible preferred stock, preferred stock and common stock offerings to date." (*Id.* ¶ 43, Ex. 11 at 5.) According to Fierro, the JDF website operated as "a landing page for someone to find JDF Capital." (*Id.* ¶ 44, Ex. 4 at 79:15–20.) Fierro also testified that one purpose of the website was to obtain new clients. (*Id.* ¶ 45, Ex. 5 at 120:3–10.) The website included an interactive form that issuers could complete to start the process of selling JDF a convertible note. (*Id.* ¶ 46.) The form required issuers to answer, among other things, questions such as: how many shares the company had issued and outstanding; how many authorized shares it had; how much convertible debt it had; who the issuer used as a transfer agent; and whether its shares were eligible for electronic transfer (known as "DWAC eligible"). (*Id.* ¶ 47, Ex. 11 at 8–10.)

Defendants hired independent contractors, including Pickett, R. Fierro, and Arzenis to solicit potential clients to sell JDF convertible notes. (*Id.* ¶¶ 48–49.) The independent contractors kept Fierro informed as to their progress in soliciting issuers to sell JDF convertible notes, and ultimately located various issuers who sold convertible notes to JDF. (*Id.* ¶¶ 51–52.)

Fierro also attended, and sometimes sponsored, microcap industry conferences, at which he promoted JDF and sought out potential issuer clients.[5] (*Id.* ¶ 53.) Principe, a JDF employee, also attended certain conferences on behalf of JDF and testified that representatives of JDF held meetings with potential issuer clients at the Marcum Conference in 2015. (*Id.* ¶¶ 54–55, Ex. 20 at 71:15–24.) During such conferences, Fierro displayed banners at a booth to promote JDF, distributed business cards and pamphlets, and provided "JDF Capital" pens. (*Id.* ¶¶ 56–58.)

---

[5] Defendants dispute whether Fierro attended microcap industry conferences specifically to solicit issuers to sell JDF convertible notes. (*See* ECF No. 35-3 at 16.)  According to Defendants, Fierro "attended and sometimes sponsored microcap industry conferences as a way to meet professionals in the industry, including attorneys, accountants and auditors, in an effort to build those relationships." (*Id.* at 18.)

Neither JDF nor Fierro has purchased convertible notes from any microcap company since June 2017, as Fierro ceased such activities upon notice of the SEC's investigation. (*See* Defs.' SOMF ¶ 14.) According to Fierro, during the Relevant Period, he did not consult SEC guidance as to the definition of a "dealer" under the Exchange Act. (*See* SEC SOMF ¶ 59, Ex. 5 at 23:7–9.)

### C.     Procedural History

The SEC filed its Complaint against Defendants on February 26, 2020, asserting two claims: (i) violation of Exchange Act Section 15(a)(1) as to both Fierro and JDF and (ii) violation, as a control person under Exchange Act Section 20(a), of Section 15(a)(1) as to Fierro. (*See generally* Compl.) On December 18, 2020, the Court denied Defendants' Motion to Dismiss the Complaint. (*See* ECF Nos. 18, 19.)

Following discovery, on January 14, 2022, the parties moved for summary judgment. (*See* Defs.' Moving Br., ECF No. 30-9; SEC Moving Br., ECF No. 31-1.) The parties each opposed the motion of the other. (*See* Defs.' Opp'n Br., ECF No. 35; SEC Opp'n Br., ECF No. 36.) And each replied. (*See* Defs.' Reply Br., ECF No. 39; SEC Reply Br., ECF No. 38.)

In tandem with their Motion for Summary Judgment, Defendants also filed a Motion *in Limine* related to the SEC's request for disgorgement in this case. (*See* Defs.' Mot. *in Limine* ("MIL") Br., ECF No. 29-2.) The SEC opposed the motion. (*See* SEC MIL Opp'n Br., ECF No. 33.) Defendants replied. (*See* Defs.' MIL Reply Br., ECF No. 37.)

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" when "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" only if it has the ability to

"affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citation omitted). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. The moving party bears the burden of showing that no "genuine issue" exists such that summary judgment is warranted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the movant adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004). Rather, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party." *Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). The court's role is "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. There can be "no genuine issue as to any material fact," however, if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23.

## III.   **DISCUSSION**

The parties cross move for summary judgment. The SEC argues that Defendants engaged in the business of buying and selling securities, rendering them "dealers" under the plain meaning of the Exchange Act, such that their failure to register with the SEC violated Exchange Act Section 15(a)(1). (*See* SEC Moving Br. at 1–4, 12–21.) According to the SEC, "[t]he undisputed facts here

establish that neither of the Defendants registered as a dealer, or properly associated with a registered dealer, even though they operated a business through which they bought securities in the form of convertible notes from penny stock companies, converted those notes into shares of stock at a substantial discount to the prevailing market price, and sold those newly issued shares into the market during the Relevant Period." (*Id.* at 2.) The SEC further asserts that Fierro is liable under Exchange Act Section 20(a) as the control person of JDF. (*See id.* at 22.)

Defendants seek summary judgment as to the charges in question on the ground that Defendants' undisputed activities show that they acted merely as "traders" under Exchange Act Section 3(a)(5)(B), not "dealers," and therefore were not required to register with the SEC. (*See* Defs.' Moving Br. at 12–20.) Relying largely upon SEC guidance and No-Action Letters, Defendants characterize the SEC's claims as an attempt "to expand the registration requirements under the Exchange Act far beyond the scope for which they were intended." (*Id.* at 1.) Alternatively, Defendants contend that the SEC's claims are barred as a matter of due process because the SEC's interpretation of "dealer" under the Exchange Act is unclear and fails to provide fair notice of activities that require registration. (*See id.* at 21–23.)

As set forth in further detail below, the undisputed facts in the record show that Defendants acted as unregistered dealers under the Exchange Act. Neither SEC guidance regarding the definition of a dealer, nor purported issues of fair notice or due process preclude this conclusion. The Court, therefore, grants summary judgment in favor of the SEC as to Defendants' liability for their failure to register as dealers.

### A.    Exchange Act Section 15(a)(1) Violations (Count I)

"Section 15(a)(1) of the Exchange Act makes it unlawful for a [dealer] to effect any transaction in, or to induce or attempt to induce the purchase or sale of any security, unless such

[dealer] is registered with the Commission or, in the case of a natural person, is associated with a registered broker-dealer." *SEC v. Cooper*, 142 F. Supp. 3d 302, 318 (D.N.J. 2015) (citing 15 U.S.C. § 78o(a)(1)); *see Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) ("The broker-dealer registration requirement serves as the 'keystone of the entire system of broker-dealer regulation.'") (citation omitted). Section 3(a)(5)(A) of the Exchange Act defines a "dealer" as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(5)(A). Excluded from the definition of a "dealer" is any "person that buys or sells securities . . . for such person's own account, either individually or in a fiduciary capacity, but not as part of a regular business"—referred to as the "trader" exception under Section 3(a)(5)(B). 15 U.S.C. § 78c(5)(B). Thus, while dealers must register with the SEC, traders are not required to do so. 15 U.S.C. § 78o(a)(1). A dealer's failure to register is a strict liability offense as "[s]cienter is not required under Section 15(a)(1)." *Cooper*, 142 F. Supp. 3d at 318.

In its prior Opinion, denying Defendants' Motion to Dismiss, the Court noted the lack of "any binding Third Circuit precedent addressing the dealer-trader distinction." *SEC v. Fierro*, No. 20-02104, 2020 WL 7481773, at *3 (D.N.J. Dec. 18, 2020) (citation omitted). The Court therefore looks to other federal decisions for guidance, acknowledging that, with the dealer-trader distinction in direct dispute, "[t]his case turns on whether Defendants engaged in the 'business of' buying and selling securities for its own account." *SEC v. Almagarby*, 479 F. Supp. 3d 1266, 1272 (S.D. Fla. 2020).

The district court's summary judgment analysis in *SEC v. Almagarby*, which addressed strikingly similar facts, is instructive here. In *Almagarby*, the district court granted summary judgment under Exchange Act Section 15(a)(1) for failure to register with the SEC, where the defendants regularly purchased the convertible debt of microcap companies, converted the debt

into stock at discounted rates, and sold the newly issued stock into the public market. 479 F. Supp. 3d at 1268, 1272. Rejecting the applicability of the trader exception, the district court found that, under Eleventh Circuit precedent, "where a company's business model is based entirely on the purchase and sale of securities, that fact constitutes conclusive proof that the company is a dealer." *Id.* at 1272 (citing *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015)).[6] The district court explained that the defendants "purchased securities from [i]ssuers at deep discounts and sold them back on the market for profit" and that the defendants' "entire business model was predicated on the quick sale of shares" from converted debt. *Id.* The district court further highlighted that "the sheer volume of the number of deals and the large sums of profit [the defendants] generated—no fewer than 962 sales of shares and more than $2.8 million in proceeds—gives credence to the proposition that [the defendants] were engaged in the 'business' of buying and selling securities." *Id.* (citation omitted).

Other courts that have addressed the "dealer" definition under the Exchange Act "generally require a 'certain regularity of participation in securities transactions.'" *SEC v. River North Equity LLC*, 415 F. Supp. 3d 853, 858 (N.D. Ill. 2019) (collecting cases); *SEC v. Offill*, No. 07-1643, 2012 WL 246061 at *9 (N.D. Tex. Jan. 26, 2012) (explaining that "[t]he best indication of someone's being 'engaged in the business' of a dealer is the 'regularity of [his] participation'

---

[6] Defendants argue that the district court's reliance on *Big Apple* in *Almagarby* was erroneous because, in *Big Apple*, the Eleventh Circuit addressed the definition of "dealer" under the Securities Act of 1933 ("Securities Act"), not the Exchange Act. (*See* Defs. Opp'n Br. at 17–19.) But the Eleventh Circuit expressly found that the two definitions are "very similar" and subject to the same analysis. *See Big Apple*, 783 F.3d at 809 n.11. Moreover, at least one other court has acknowledged the import of *Big Apple* with respect to the dealer-trader distinction under the Exchange Act, rejecting arguments to the contrary. *See SEC v. Keener*, No. 20-21254, 2020 WL 4736205, at *5 n.2 (S.D. Fla. Aug. 14, 2020) ("Although Defendant stresses that *Big Apple* does not apply because that court interpreted the Securities Act of 1933 rather than the Exchange Act . . . the Court is not persuaded."). Importantly, the definitions of "dealer" under the Securities Act, 15 U.S.C. § 77b(a)(12), and under the Exchange Act, 15 U.S.C. § 78c(5)(A), both focus on whether the person is "in the business" of securities transactions.

in the buying and selling of securities for his own account") (citation omitted). As such, courts similarly tend to focus on the volume of the securities transactions in which the person or entity engaged. *See SEC v. Keener*, 580 F. Supp. 3d 1272, 1286–87 (S.D. Fla. 2022) (granting summary judgment in favor of the SEC and finding that defendant operated as a dealer under the Exchange Act, where defendant "converted more than 100 convertible notes from more than 100 different microcap issuers," "liquidated billions of shares of common stock," "sought to make a profit from selling the converted stock," and "generated approximately $10 million in net proceeds from these transactions"); *River North Equity LLC*, 415 F. Supp. 3d at 858 (denying motion to dismiss where "during the relevant period River North bought and sold over 10 billion shares of stock from more than 62 microcap issuers, and then quickly resold them to the investing public, receiving some $31 million in profit"). Indeed, as this Court previously noted, "[t]he primary indicia in determining that a person has 'engaged in the business' within the meaning of the term 'dealer' is that the level of participation in purchasing and selling securities involves more than a few transactions." *Fierro*, 2020 WL 7481773, at *4 (citation omitted).

Here, under the plain language of the Exchange Act, the undisputed facts show that Defendants were required to register as dealers with the SEC. Defendants concede that, looking only at their ten highest grossing stocks during the Relevant Period, they sold approximately 5.7 billion shares of stock from converted notes. (*See* SEC SOMF ¶ 31.) Defendants also admit that those sales resulted in approximately $5.4 million in proceeds and approximately $2.3 million in profits.[7] (*See id.* ¶ 32.) These undisputed share volumes, proceeds, and profits are strong indicators

---

[7] The SEC submits evidence indicating that the volume of Defendants' business was even greater. According to the SEC, Defendants' own documents show that their convertible notes business included the sale of more than 10.56 billion shares of stock from converted notes, generating more than $8.53 million in proceeds and approximately $4.80 million in profit. (*See* SOMF ¶¶ 33–34, Ex. 12.) However, because Defendants dispute these calculations, for purposes of the present motions, the Court will consider only the volume of business to which Defendants have admitted.

that Defendants engaged in the "business" of buying and selling securities. *See Almagarby*, 479 F. Supp. 3d at 1272 (finding that $2.8 million in proceeds generated by the sale of stock from converted debt indicated defendants' activities constituted "business" under the Exchange Act). Moreover, in order to generate such proceeds and profits, Defendants acquired newly issued stock directly from microcap issuers, at significant discounts based on the terms of the convertible notes, and then resold that stock to the public—further evidencing Defendants' status as dealers, not traders. *See Keener*, 580 F. Supp. 3d at 1287–88 ("As further evidence that [d]efendant meets the statutory 'dealer' definition, [d]efendant acquired newly issued stock directly from microcap issuers at a discount, ranging between 10% to 50% depending on the terms of the convertible notes, and then resold the stock into the public market."); *River North Equity LLC*, 415 F. Supp. 3d at 859 (finding it "particularly significant" that, "like an underwriter," defendant (1) "purchased stocks at a discounted price directly from numerous issuers" rather than "purchasing stocks already in the marketplace, like a trader" and (2) "turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price"); *see also Big Apple*, 783 F.3d at 810 ("As further evidence of their dealer status, [defendants] purchased [issuer's] stocks at deep discounts pursuant to its contractual agreement with [the issuer] and then sold those stocks for profit."); *Almagarby*, 479 F. Supp. 3d at 1272 ("It is undisputed that [d]efendants purchased securities from [i]ssuers at deep discounts and sold them back on the market for profit.").[8] Other indications that Defendants engaged in a regular business of buying

---

[8] According to Defendants, "dealer" activity under the Exchange Act "entails 'buying and selling *the same security simultaneously*." (Defs.' Moving Br. at 10.) But the weight of recent persuasive authority rejects this position. For instance, in *Securities and Exchange Commission v. Fife*, No. 20-5227, 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021), relying upon several of the cases cited herein, the district court squarely rejected the argument that "the 'traditional' meaning of dealer requires that a person buy and sell the same securities in the same condition." *Id.* at *5–6.

and selling securities such that they were required to register as dealers include: Defendants maintained an office in Freehold, New Jersey (*see* SEC SOMF ¶ 5); Defendants hired an employee and utilized independent contractors to further their convertible notes activities (*see id.* ¶¶ 7, 9, 48, 52); Defendants advertised and promoted their convertible notes business, including through a website (*see id.* ¶ 39, Ex. 11); and Defendants sponsored and attended conferences at which they promoted JDF's convertible notes business and solicited issuers to sell JDF convertible notes (*see id.* ¶¶ 53–58).

Defendants resist the conclusion that they operated as unregistered dealers under the Exchange Act by relying largely on SEC guidance, No-Action Letters, and scholarly articles. (*See* Defs.' Moving Br. at 8–18; Defs.' Opp'n Br. at 6–16.) According to Defendants, "[f]rom at least 1975, the SEC has codified a factors-based understanding of the dealer definition in a plethora of Commission Releases, No-Action Letters, and other published guidance that constitute the controlling law that now applies to determining whether a person is a securities dealer."[9] (*See* Defs.' Moving Br. at 13–14.) However, as the relevant case law demonstrates, the Court need not look past the clear statutory language of the Exchange Act in favor of a factors-based approach to determine if Defendants were engaged in dealer activity. *See Keener*, 580 F. Supp. 3d at 1285 (stating that "the Court is unconvinced that it should overlook the actual statutory language of the Exchange Act and instead look only to the factors set forth in the SEC [Guide to Broker-Dealer Registration] to determine whether [d]efendant was engaged in 'dealer' activity"); *Almagarby*, 479

---

[9] Defendants assert that the relevant factors for the Court to consider include whether Defendants engaged in: "(1) soliciting, providing services to, and interacting with investors; (2) creating a market in particular securities by standing ready to buy and sell those securities on a continuous basis; and (3) carrying a dealer inventory to respond to customer demand." (Defs.' Moving Br. at 14; Defs.' Opp'n Br. at 11.) As set forth *infra*, factors derived from SEC guidance and No-Action letters, including Defendants' own formulation of such factors, are ultimately non-binding with respect to the Court's assessment of whether Defendants acted as unregistered dealers.

F. Supp. 3d at 1273 (explaining that the "various factors and activities identified in previous SEC releases or SEC staff no-action letters" are "merely examples of activity or actions that might render one a dealer," and "[t]here is nothing in any of the cited releases or no-action letters that implies that the listed factors are an exclusive or exhaustive checklist that creates a burden of proof for the SEC"); *River North Equity LLC*, 415 F. Supp. 3d at 858 (stating that "various SEC no-action letters and other guidance" are "not controlling" and "are neither exclusive, nor function as a checklist through which a court must march to resolve a dispositive motion").[10] Notably, even if the factors set forth in SEC publications and guidance over the years were binding authority (they are not), the record abounds with undisputed evidence that Defendants maintained an interactive website promoting their convertible notes business, paid independent contractors to find issuers who were willing to sell them convertible notes, and sponsored and attended conferences to advertise their convertible notes business to microcap issuers. (*See* SEC SOMF ¶¶ 5, 7, 9, 39, 48,

---

[10] In support of a factors-based approach to determining whether a person qualifies as a dealer under the Exchange Act, Defendants rely heavily on the district court's analysis in *Securities and Exchange Commission v. Federated Alliance Group. Inc.* No. 93-0895E, 1996 WL 484036 (W.D.N.Y. Aug. 21, 1996). There, the district court acknowledged "various factors which [the SEC] considers when determining if an entity is a dealer of government securities." *Id.* at *4. Rejecting the SEC's assertion that the defendant entity qualified as a dealer, the district court noted that "there is no evidence that Federated advertised or otherwise held itself out as a dealer in securities including government securities, acted as an underwriter for issuers of government securities, carried an inventory in government securities, participated in a selling group, extended credit or arranged for the extension of credit to others for the acquisition of government securities, rendered investment advice or otherwise conducted its affairs in a manner which could reasonably be interpreted as sufficiently engaging in the business of buying and selling government securities to be classified as a dealer of such." *Id.* at *5. Importantly, however, the district court's factor-oriented assessment in *Federated Alliance* hardly precludes finding Defendants qualified as dealers here. Nothing in *Federated Alliance* holds that the enumerated factors are controlling or displace the statutory language of the Exchange Act. *See id.* at *4 n.39 ("The few courts that have considered statutory language defining 'dealers' have required that a party be shown to have regularly participated in securities transactions at key points in the distribution chain in order to be characterized as a dealer.") Further, unlike in *Federated Alliance*, the present case includes evidence that Defendants held their convertible notes business out to the public via an interactive website, sales calls, and in-person conferences.

52, 53–58.) Such activity sufficiently demonstrates that Defendants, like dealers, held themselves out as being willing to buy and sell a particular security on a continuous basis.[11] *See Keener*, 580 F. Supp. 3d at 1288–89 (applying SEC guidance and finding that defendant acted as a dealer and "[held] himself out as being willing to buy and sell a particular security on a continuous basis," where defendant "operated a website that described his business operations," "hired employees to find issuers who were willing to sell convertible notes to him," and "sponsored and attended conferences in which he and his employees would find microcap issuers in person").

In sum, based on the "sheer volume" of Defendants' convertible notes activity and the significant profits it generated, Defendants "were engaged in the 'business' of buying and selling securities." *See Almagarby*, 479 F. Supp. 3d at 1272. Defendants were, therefore, required to register with the SEC as dealers, *see* 15 U.S.C. § 78o(a)(1), and it is undisputed that they did not. (*See* SEC SOMF ¶ 6.) Defendants' argument that the conduct at issue falls within the trader exception to the SEC's registration requirements fails in light of the plain language of the Exchange Act and persuasive authority, discussed above, addressing virtually identical business activity. *See, e.g.*, *Keener*, 580 F. Supp. 3d at 1286–89; *Almagarby*, 479 F. Supp. 3d at 1272–73. Accordingly, the SEC is entitled to summary judgment with respect to its Section 15(a)(1) claims against Defendants.

---

[11] Defendants cite a plethora of piecemeal, non-binding guidance from the SEC regarding the definition of a "dealer" under the Exchange Act. One source of guidance, cited by both sides, is the SEC Division of Trading and Markets' *Guide to Broker-Dealer Registration*. *See Guide to Broker-Dealer Registration*, U.S. Securities and Exchange Commission, Division of Trading and Markets, Apr. 2008, https://www.sec.gov/about/reports-publications/investor-publications/guide-broker-dealer-registration ("SEC Broker-Dealer Guide"). Therein, the SEC provides, in part, that "the following individuals and businesses may need to register as a dealer," including, "a person who holds himself out as being willing to buy and sell a particular security on a continuous basis." *See* SEC Broker-Dealer Guide § II.B.

**B.      Fierro's Liability as a Control Person of JDF (Count II)**

Count II of the SEC's Complaint against Defendants charges Fierro, as a "control person"

of JDF under Exchange Act Section 20(a), with liability for JDF's violations of Section 15(a)(1).

(*See* Compl. ¶¶ 31–35.) Section 20(a) of the Exchange Act imposes joint and several liability on

"[e]very person who, directly or indirectly, controls any person liable under" any provision of the

Exchange Act "unless the controlling person acted in good faith and did not directly or indirectly

induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Liability

under Section 20(a) requires "(1) an underlying violation by the company; and (2) circumstances

establishing [the] defendant's control over the company's actions." *In re Cognizant Tech. Sol.*

*Corp. Sec. Litig.*, No. 16-6509, 2020 WL 3026564, at *32 (D.N.J. June 5, 2020) (quoting *Jones v.*

*Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 645 (D.N.J. 2003)). "To establish that a defendant is a

control person, a plaintiff must demonstrate [that] the defendant had actual power or influence

over the allegedly controlled company." *Jones*, 274 F. Supp. 2d at 645 (internal quotation marks

and citations omitted).

As explained above, JDF violated Section 15(a)(1) by its failure to register with the SEC

as a dealer. And Defendants do not dispute that Fierro is the sole owner and operator of JDF. (*See*

Defs.' SOMF ¶¶ 3–4; SEC SOMF ¶ 3.) Indeed, Fierro "had the power to control the general affairs

of [JDF] at the time it committed its violations and, further, he possessed the power to directly or

indirectly control or influence [JDF's] specific policies which resulted in its primary liability."

*Almagarby*, 479 F. Supp. 3d at 1273. Thus, Fierro is subject to control person liability pursuant to

Exchange Act Section 20(a).

**C.      Defendants' Due Process Defense**

Defendants' Second Affirmative Defense in this action states that "Defendants had no fair

notice that their conduct was/could be unlawful" and that the SEC's claims are "barred by due process." (*See* ECF No. 21 at 8.) Defendants now argue that the SEC's claims against them must fail because "an agency cannot change an interpretation when doing so would impose new liability for past actions which were taken in good-faith reliance on agency pronouncements" and "[n]o SEC guidance on dealer status available during the Relevant Period discussed convertible notes or conversion discounts as facts that would support dealer designation." (Defs.' Moving Br. at 21–22.) The SEC, on the other hand, contends that "[t]he language of Exchange Act Sections 3(a)(5)(A) and 15(a)(1) is clear and unambiguous, and Defendants can point to no case holding otherwise." (SEC Moving Br. at 25.) The SEC further asserts that "the Court should reject any argument that the SEC was required to or failed to provide guidance with respect to the dealer registration statute" and that, in any event, "[s]taff of the SEC's Division of Trading and Markets provides the public guidance about who might be operating as a dealer on the Commission's website, but Fierro never even consulted it." (*Id.* at 27–28.) In denying Defendants' Motion to Dismiss, the Court squarely rejected the due process defense raised by Defendants at that time. *See Fierro*, 2020 WL 7481773, at *5 ("The Court, accordingly, does not find any violation of due process.") Defendants' due process argument fairs no better at summary judgment.

A "punishment violates the Due Process Clause of our Constitution if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 249 (3d Cir. 2015) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). "The level of required notice for a person to be subject to liability varies by circumstance." *Id.* For instance, "[l]esser degrees of specificity are allowed in civil cases because the consequences are smaller than in the criminal

context" and "[t]he standards are especially lax for civil statutes that regulate economic activities." *Id.* (internal quotation marks and citations omitted). "For those statutes, a party lacks fair notice when the relevant standard is 'so vague as to be no rule or standard at all.'" *Id.* (quoting *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 631–32 (3d Cir. 2013)).

Defendants do not contend that the Exchange Act itself is either vague or ambiguous. Instead, Defendants insist that the SEC departed from its past interpretation of "dealer" under the Exchange Act, as set forth in various forms of guidance, thereby depriving them of fair notice that their conduct fell within the SEC's purportedly new interpretation. (*See* Defs.' Moving Br. at 21–23; Defs.' Opp'n Br. at 22–25.) This argument is unavailing.

First, Defendants' focus on the SEC's interpretation and guidance is erroneous as "[t]he relevant question is not whether [the defendant] had fair notice of the [SEC's] *interpretation* of the statute, but whether [the defendant] had fair notice of what the *statute itself* requires." *Wyndham*, 799 F.3d at 254–55 (emphasis in original). Moreover, even if Defendants had challenged the statutory language, the Court doubts the viability of any argument that Exchange Act Section 15(a)(1) or the dealer definition under Section 3(a)(5) contains "no standard of conduct or rule at all" for fair notice purposes. *See id.* at 250. As the Court previously found at the motion to dismiss stage, "the definition of dealer under Section 3(a)(5) is broad and . . . Defendants are not amateur investors." *Fierro*, 2020 WL 7481773, at *5. Second, the Court "is unconvinced that [the SEC] changed its interpretation of the Exchange Act's 'dealer' definition to pursue this enforcement action." *Keener*, 580 F. Supp. 3d at 1290. Although Defendants may not have been aware that their convertible notes business rendered them dealers under the Exchange Act, Defendants cannot point to any authority holding that the SEC was required to explicitly provide its interpretation of the statute to the public or set forth a precise list of activities that fall within its

purview. *See Wyndham*, 799 F.3d at 255 (explaining that "[the defendant] is only entitled to notice of the meaning of the statute and not to the agency's interpretation of the statute"). Even so, the SEC Broker-Dealer Guide, which is available to the public on the Commission's website, *see supra* n.11, identifies certain activities that could require registration under the relevant statutory framework. Fierro admits he did not consult such guidance. (*See* SEC SOMF ¶ 59.) Third, to the extent Defendants argue that the issue of fair notice is appropriate for submission to a jury,[12] (*see* Defs.' Opp'n Br. at 25), Defendants overlook that the material facts of this case are undisputed, and that "the court . . . is the ultimate arbiter of the statute's meaning." *Wyndham*, 799 F. 3d at 251. Notably, courts have granted summary judgment in favor of the SEC on Section 15(a)(1) claims based on analogous factual circumstances and in the face of similar due process defenses. *See Keener*, 580 F. Supp. 3d at 1286–91; *Almagarby*, 479 F. Supp. 3d at 1272–73.

As with Defendants' challenge to the merits of the SEC's claims, Defendants' due process defense mistakenly emphasizes the significance of SEC guidance rather than the plain language of Exchange Act. Defendant's due process defense fails as a matter of law; the SEC is entitled to summary judgment as to Defendants' Second Affirmative Defense. As such, the SEC's Motion

---

[12] Defendants also assert that "this Court should rule that the issue of industry custom and practice around the 'dealer' definition is a factual issue, appropriate for submission to a jury." (Defs.' Opp'n Br. at 25.) However, this conclusory contention is without merit as Defendants have not introduced any evidence as to industry custom or explained how such evidence would be relevant, considering that Section 15(a)(1) violations are strict liability offenses.

for Summary Judgment is granted in its entirety.[13]

### D.    Defendants' Motion *in Limine*

Contemporaneously with their Motion for Summary Judgment, Defendants filed a Motion *in Limine*, seeking to preclude the SEC from presenting evidence related to its request for disgorgement, including "(1) the alleged victims or harm purportedly caused by JDF Capital and/or Mr. Fierro's alleged improper conduct, (2) any net profits calculation, and/or (3) any witness testimony concerning the foregoing that [the SEC] failed to provide during discovery." (Defs. MIL Br. at 1, 11.) That Motion was brought prematurely, prior to a liability determination, and is denied.[14] That said, certain issues raised by the Motion warrant explanation as they relate to the remedies available to the SEC in this matter and the relevant procedures associated with the remedies phase of the litigation.

"Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). The Third Circuit has

---

[13] In addition to Defendants' Second Affirmative Defense (due process), the SEC also seeks summary judgment as to Defendants' Third Affirmative Defense (estoppel). (*See* SEC Moving Br. at 29–31.) Defendants did not respond to the SEC's Motion in this respect and have therefore abandoned the defense. Regardless, as the SEC highlights, the Third Circuit has held that estoppel is not a legally cognizable defense in SEC enforcement actions. *See SEC v. Morgan, Lewis, & Bockius*, 209 F.2d 44, 49 (3d Cir. 1953) (stating that "the [C]ommission may not waive the requirement of an act of Congress nor may the doctrine of estoppel be invoked against the Commission"). Defendants' First and Eighth Affirmative defenses (failure to state a claim under Section 15(a)(1) and Section 20(a)) were disposed of by the Court's denial of Defendants' Motion to Dismiss. *See generally Fierro*, 2020 WL 7481773. And, finally, Defendants Fourth, Fifth, Sixth, and Seventh Affirmative Defenses relate solely to whether the SEC is entitled to various forms of relief (injunctive relief, disgorgement, civil penalties, and a penny-stock bar). These remaining Affirmative Defenses do not constitute defenses to liability and should be addressed upon further briefing at the remedies stage of the litigation.

[14] Importantly, the evidence that Defendants sought to preclude from consideration, which relates solely to a potential disgorgement remedy, has no bearing on the Court's summary judgment decision, which addresses liability only.

"adopted a burden-shifting approach" to assessing a disgorgement request by the SEC. *SEC v. Bonan Huang*, 684 F. App'x 167, 176 (3d Cir. 2017) (citing *SEC v. Teo*, 746 F.3d 90, 105–07 (3d Cir. 2014)). "First, 'the SEC is required to produce evidence supporting a reasonable approximation of actual profits on the tainted transactions.'" *Id.* (quoting *Teo*, 746 F.3d at 105). "This creates a presumption of illegal profits." *Teo*, 746 F.3d at 105. "Once the SEC has made this showing, the burden shifts back to the defendant to 'demonstrate that the disgorgement figure [is] not a reasonable approximation.'" *Id.* (quoting *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1232 (D.C. Cir. 1989)). "In evaluating these steps, a District Court may take into account facts that were not determined by the jury, but it may not base its decision on factual findings that conflict with the jury's findings." *Bonan Huang*, 684 F. App'x at 176 (internal quotation marks and citations omitted). In general, "[t]he district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *First Jersey Sec., Inc.*, 101 F.3d at 1474–75.

Defendants' Motion *in Limine* largely ignored these well-established principles. Instead, prior to a liability determination, Defendants claimed that they had been improperly deprived of discovery related to disgorgement by the SEC under *Liu v. Securities and Exchange Commission*, 140 S. Ct. 1936 (2020). However, *Liu* neither created new disclosure requirements for the SEC, nor did it displace the processes, set forth above, generally associated with a disgorgement remedy. In *Liu*, the Supreme Court addressed courts' authority to order disgorgement under 15 U.S.C. § 78u(d)(5), which authorizes the SEC to seek, and courts to award, "equitable relief that may be appropriate or necessary for the benefit of investors." *Id.* at 1940. The Supreme Court ultimately held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." *Id.* The Supreme Court did not address

"what traditional equitable principles govern when, for instance, the wrongdoer's profits cannot practically be disbursed to the victims," and stated that "lower courts may evaluate in the first instance whether [an order directing disgorgement funds to the Treasury] would indeed be for the benefit of investors as required by § 78u(d)(5) and consistent with equitable principles." *Id.* at 1949–50. At no point did the Supreme Court, as Defendants suggest, impose upon the SEC new obligations to identify individual victimized investors or to quantify their losses prior to a finding of liability or a disgorgement award. As such, Defendants Motion misapprehended the import of *Liu*, which does not bear on the SEC's discovery obligations as they relate to disgorgement.

Having now established Defendants' liability at summary judgment, the Court will, upon further briefing of the parties, consider appropriate remedies. Whether to order disgorgement and the amount to be disgorged remains within the broad discretion of the Court and will be assessed in accordance with the burden-shifting approach endorsed by the Third Circuit. In seeking disgorgement, the SEC should address whether any potential amount to be disgorged must be returned to harmed investors and, if so, the feasibility of doing so here. Defendants may respond and set forth any arguments in opposition to disgorgement, including disputes as to any potential amount identified by the SEC or whether disgorgement is warranted at all in this matter.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the SEC's Motion for Summary Judgment is **GRANTED**; Defendants' Motion for Summary Judgment and Motion *in Limine* are **DENIED**. An appropriate Order will follow.

Date: June 29th, 2023

_____
**Hon. Georgette Castner**
**U.S. District Judge**