<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

<table>
<tr>
<td>

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

   v.

JOHN D. FIERRO, *et al.*,

                Defendants.

</td>
<td>

Civil Action No. 20-02104 (GC) (JBD)

**<u>OPINION</u>**

</td>
</tr>
</table>

<u>**CASTNER, District Judge**</u>

      **THIS MATTER** comes before the Court upon Plaintiff Securities and Exchange Commission's (the SEC's) Motion for final judgments and to impose remedies against Defendants John D. Fierro and JDF Capital, Inc. (ECF No. 55.) Defendants opposed, and Plaintiff replied. (ECF Nos. 56 & 59.) The Court has carefully considered the submissions and decides the motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Plaintiff's Motion is **GRANTED** in part and **DENIED** in part.

**I.**      <u>**BACKGROUND**</u>

      On June 29, 2023, the Court granted the SEC's motion for summary judgment. (ECF No. 50.) The Court's decision established the Defendants' liability for acting as unregistered securities dealers in violation of Section 15(a)(1) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78o(a)(1) and found that Fierro is liable for JDF's violations of Section 15(a)(1) as a control person of JDF under Exchange Act Section 20(a), 15 U.S.C. § 78t(a). (*Id.*) The Court

incorporates and presumes the reader's familiarity with that earlier decision, which recites this case's procedural history and factual background.[1]  (*See id.*)

After granting the SEC's motion for summary judgment and denying Defendants' cross motion for summary judgment, the Court directed the parties to submit further briefing as to appropriate remedies.  (*Id.* at 22.[2])  In the SEC's Motion for final judgments and to impose remedies, the SEC asks the Court to (1) enjoin Defendants from committing further violations of the Exchange Act § 15(a)(1); (2) permanently bar Defendants from participating in an offering of penny stock; (3) order Defendants to pay disgorgements and (4) prejudgment interest; (5) levy a civil penalty against each Defendant; (6) allow the SEC to establish a Fair Fund for the benefit of victims; and (6) order Defendants to surrender for cancellation any remaining shares and conversion rights.  (ECF No. 55.)  Defendants oppose all of the requested remedies except for surrendering and cancelling their remaining shares and conversion rights at issue.  (ECF No. 56.)

## II.   DISCUSSION

The Court addresses each of the SEC's requested remedies in turn.

### A.   Permanent Injunction

First, the SEC asks the Court to permanently enjoin Defendants from committing any further violations of § 15(a)(1).  To determine whether injunctive relief is appropriate in a securities case, a court must consider "whether there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct."  *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir.

---

[1]      The decision can also be found at *SEC v. Fierro*, Civ. No. 20-02104, 2023 WL 4249011 (D.N.J. Jun. 29, 2023).

[2]      Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

1980) (citations omitted).  The purpose of an "obey-the-law" injunction is not to "punish the defendant or deter others,"[3] but to deter the defendant from committing future infractions of securities laws.[4]  In determining whether to issue injunctive relief, the United States Court of Appeals for the Third Circuit has articulated five factors that courts should assess: "(1) the degree of scienter involved; (2) the isolated or repeated nature of the violations; (3) the defendant's recognition of the wrongful nature of the conduct; (4) the sincerity of the defendant's assurances, if any, against future violations; and (5) the likelihood that the defendant's occupation will present opportunities for future violations."  *SEC v. Desai*, 145 F. Supp. 3d 329, 337 (D.N.J. 2015), *aff'd*, 672 F. App'x 201 (3d Cir. 2016) (citing *Bonastia*, 614 F.2d at 912).

As to the first factor, the SEC has not alleged, nor did the Court find at summary judgment, that Defendants acted with scienter.  (ECF No. 55 at 10.)  A finding of scienter is not a prerequisite to injunctive relief if scienter is not an element of the charged offense.  *Aaron v. SEC*, 446 U.S. 680, 701 (1980).  A district court, however, may consider a lack of scienter as a mitigating factor in deciding whether to grant injunctive relief.  *Id.*  Accordingly, the Court finds that this factor weighs against imposing an injunction.  *See SEC v. Keener*, 644 F. Supp. 3d 1290, 1299 (S.D. Fla. 2022) (finding that an unregistered dealer's lack of scienter weighed against an injunction).

The recurrent nature of Defendants' violations, however, weighs in favor of an injunction. Defendants argue that their failure to register should count as only a single violation.  In support, Defendants cite two decisions from SEC proceedings that treated respondents' operations as unregistered broker-dealers as "one course of action" when discussing civil penalties.  (ECF No. 56 at 9 (first citing *In re David b. Havanich, Jr.*, SEC Release No. 935, 2016 WL 25746, at *11

---

[3]      *SEC v. Gentile*, 939 F.3d 549, 553, 562 (3d Cir. 2019).

[4]      *Bonastia*, 614 F.2d at 912.

(Jan. 4, 2016), and then citing *In re Spring Hill Cap. Mkts.*, SEC Release No. 919, 2015 WL 7730856, at *19 (Nov. 30, 2015).)  But in those same decisions, when deciding whether to issue cease-and-desist orders, the Administrative Law Judges characterized the respondents' conduct as "recurrent."   *See Havanich*, 2016 WL 25746, at *10 ("Respondents' conduct in operating as unregistered brokers was recurrent over more than two years."); *Spring Hill*, 2015 WL 7730856, at *17 (finding that the respondent's conduct in operating "as an unregistered broker-dealer was . . . recurrent over a period of ten months").  Here, Defendants operated as unregistered dealers for almost three years, from January 2015 through November 2017.  (ECF No. 31-2 ¶ 11.)  Courts typically hold such conduct to be "recurrent" in similar circumstances.  *See, e.g.*, *SEC v. Ibrahim Almagarby*, 92 F.4th 1306, 1321-22 (11th Cir. 2024) (holding that the district court did not abuse its discretion in issuing a permanent injunction in part because the defendant engaged in hundreds of transactions over three years as an unregistered dealer); *SEC v. Murphy*, 50 F.4th 832, 848 (9th Cir. 2022) (holding that the district court did not abuse its discretion when it calculated the defendant's total § 15(a) violations by each month that he traded as an unregistered broker, which was "especially reasonable . . . because the district court could have found thousands of violations if it had relied on the number of transactions [the defendant] made as an unregistered broker"); *Keener*, 644 F. Supp. 3d at 1299 (finding the defendant's conduct "recurrent because he disregarded the dealer registration requirement during a period of over three years as he acted as an unlicensed dealer").

The Court also finds that the third and fourth factors weigh in favor of an injunction. Defendants argue that their cessation of unregistered dealer activity for over six years demonstrates their assurance that they will not violate any securities law in the future.  (ECF No. 56 at 9-10.) But the Defendants ceased their convertible note activity only after learning that the SEC was

investigating them.  (ECF No. 30-1 ¶ 14.)  "It is well settled . . . that cessation of illegal activities in contemplation of an SEC suit does not preclude the issuance of an injunction enjoining violations."  *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1101 (2d Cir. 1972) (finding that the district court did not abuse its discretion by enjoining defendants who had ceased illegal activity prior to initiation of suit).  And "current compliance with the law does not render injunctive relief unavailable. . . . [J]ust because defendants may refrain from illegal activity during litigation does not mean they are unlikely to violate the securities laws again."  *Murphy*, 50 F.4th at 851.  While Defendants are entitled to vigorously defend against an SEC enforcement action,[5] "the defendant's recognition of the wrongful nature of the conduct" and "the sincerity of the defendant's assurances, if any, against future violations" are relevant, if not weighty, factors in the Court's analysis.  *See Desai*, 145 F. Supp. 3d at 337 (citing *Bonastia*, 614 F.2d at 912).  Here, Defendants have not offered any evidence assuring the Court that they have recognized the wrongful nature of their conduct and will not commit future violations.  *See Keener*, 644 F. Supp. 3d at 1300 (recognizing that the defendant has a right to a full and vigorous defense but noting that the defendant has not recognized the wrongful nature of his conduct).

As for the final factor of whether Defendant Fierro's occupation will present opportunities for future violations — Fierro has made a living as an investor for over twenty years, and "the buying and selling of securities for its own account" is JDF's inherent business model.  (ECF No. 30-3 ¶ 4; ECF No. 31-4 at 10.)  Other courts have found that such extensive experience working

---

[5]     Defendants cite *SEC v. Yun*, 148 F. Supp. 2d 1287, 1294 (M.D. Fla. 2001), to argue that they should not be penalized for vigorously defending against the SEC's civil action.  But *Yun* is distinguishable from the case at hand.  There, the defendants' conducted occurred over a mere three days, and though the defendants did not admit to any wrongdoing, they "expressed their regret at involvement in the insider trading scheme."  *Id.*  The Court has no such evidence in this case.

in securities weighs in favor of granting injunctive relief.  *See SEC v. CKB168 Holdings, Ltd.*, 2022 WL 3347253, at *3 (E.D.N.Y. Aug. 12, 2022) (citing *SEC v. Baccam*, 2017 WL 5952168, at *9 (C.D. Cal. Jun. 14, 2017), which found "that the defendant's 'more than a decade of experience in the securities industry' raised the possibility that he would engage in future misconduct").  And Fierro testified at his deposition that he had no current income, was "trying to figure out" how he would earn income in the future and had last earned income by settling debt owed through convertible note transactions.  (*See* ECF No. 30-5 at 48-50.)   Defendants' years of experience in the securities industry, and a lack of any indication that Defendants are likely to change occupations, weigh in favor of finding it reasonably likely that Defendants' occupation will present opportunities for future violations. *See, e.g.*, *Bonastia*, 614 F.2d at 912-13 (finding that even where a defendant had changed his occupation, the violations' repetitiveness and defendant's scienter weighed in favor of imposing an injunction).

For these reasons, the Court finds that on balance, the SEC has met its burden under the *Bonastia* factors of establishing a reasonable likelihood that Defendants, if not enjoined, will again engage in the illegal conduct.  The Court will enter a permanent injunction enjoining Defendants from violating Section 15(a) of the Exchange Act.

### B.     Penny Stock Bar

Next, the SEC asks the Court to issue a "penny stock bar."  (ECF No. 55 at 12.)  The Court's authority to issue a penny-stock bar comes from the Exchange Act, which states:

> In any proceeding under paragraph (1) against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock, the court may prohibit that person from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine.

[15 U.S.C. § 78u(d)(6)(A).]

6

Here, from January 2015 through November 2017, "at the time of the alleged misconduct," Defendants were "participating in an offering of penny stock" when they "purchased convertible notes from more than 20 different penny stock issuers, converted those notes into stock, and sold nearly 6.5 million newly issued shares into the public market."  *See Fierro*, 2023 WL 4249011, at *2.

The Third Circuit has observed that "courts use similar factors to decide whether to issue both industry bars and obey-the-law injunctions."  *Gentile*, 939 F.3d at 555 (citing *SEC v. Kahlon*, 873 F.3d 500, 506-07 (5th Cir. 2017)).  These factors include "(1) the egregiousness of the defendant's securities violations; (2) previous securities violations, if any . . . (3) the defendant's role or position when he committed the [misconduct]; (4) the degree of the defendant's scienter; (5) the defendant's personal gain from the [misconduct]; and (6) the likelihood of future misconduct."  *SEC v. Johnson*, Civ. No. 02-5490, 2004 WL 5561799, at *4 (D.N.J. Aug. 27, 2004), *aff'd as modified*, 174 F. App'x 111 (3d Cir. 2006) (imposing a penny stock bar after using the six-factor test to bar the defendant from acting as an officer or director of a public company).[6]

While the test for imposing a penny stock bar differs slightly between circuits, they share the common factor of whether the defendant's conduct was "egregious."[7]  The Third Circuit has also cautioned that while "[e]njoined defendants suffer harm to their personal and business reputations . . . when a court bans a defendant from his industry, it imposes what in the administrative context has been called the 'securities industry equivalent of capital punishment.'"

---

[6]    *See also SEC v. Becker*, 2010 WL 2710613, at *1 (S.D.N.Y. Jul. 8, 2010) ("The standard for imposing a penny stock bar mirrors that for imposing an officer-or-director bar." (citing *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 429-30 (S.D.N.Y. 2007)).

[7]    *Compare Johnson*, 2004 WL 5561799, *with Kahlon*, 873 F.3d at 506 (employing slightly different tests that both include the "egregiousness" factor).

*Gentile*, 939 F.3d at 566 (citations omitted).

Here, the Court has already found that the Defendants' misconduct was recurrent and is likely to recur without a permanent injunction. "Defendants do not dispute that Fierro is the sole owner and operator of JDF." *Fierro*, 2023 WL 4249011, at *7. And the SEC has submitted evidence indicating that the Defendants' convertible notes business generated approximately $4.80 million in profits. *Id.* at *6 n.7. Thus, the Defendants' personal gain from the misconduct, Fierro's role when he committed the misconduct, and the likelihood of future misconduct all weigh in favor of a penny stock bar. *See Johnson*, 2004 WL 5561799, at *4.

The SEC, however, concedes that Defendants' conduct was not egregious. (ECF No. 55 at 12.) Nor does the SEC allege that Defendants acted with scienter.[8] (*Id.* at 10.) And while the Defendants' misconduct was recurrent, the SEC has not alleged any other previous securities violations. Courts often rely heavily on these factors when deciding to issue penny stock bars, or the "securities industry equivalent of capital punishment."[9] *See, e.g.*, *Johnson*, 2004 WL 5561799, at *4 (issuing a penny stock bar after finding that the defendant (1) committed egregious misconduct; (2) had previous securities violations; and (3) acted with a high degree of scienter); *Becker*, 2010 WL 2710613, at *2 (ordering a penny stock bar where the defendants committed fraud with "a high degree of scienter").

The SEC argues that this matter is similar to other cases where courts issued penny stock bars for non-scienter-based § 15(a) violations, citing *Keener*, 644 F. Supp. 3d at 1303 (imposing a five-year penny stock bar), and *Almagarby*, 2022 WL 832279, at *2. But in *Keener*, a penny stock

---

[8]     As the Court has already noted, while a finding of scienter is not necessary where it is not an element of the charged offense, the Court may consider it as a mitigating factor. *See Aaron*, 446 U.S. at 701.

[9]     *Gentile*, 939 F.3d at 566 (citations omitted).

bar was necessary to prevent future misconduct in part due to some additional aggravating misconduct that is not present in this case.[10]  And while the Eleventh Circuit in *Almagarby* affirmed the district court's "obey-the-law" injunction, it found that the district court abused its discretion in ordering a penny stock bar because of a lack of egregiousness and scienter.  92 F.4th 1306, 1321 (11th Cir. 2024) (describing scienter as "an important factor in this analysis" (citations omitted)).

Similarly here, while the SEC has established that an injunction against unlawful activity is necessary to prevent future misconduct, the "loss of livelihood and the stigma attached to permanent exclusion from the corporate suite certainly requires more."  *Gentile*, 939 F.3d at 560 (quoting *SEC v. Patel*, 61 F.3d 137, 142 (2d Cir. 1995) (affirming a district court's injunction against future misconduct but reversing the district court's officer-or-director bar in part due to a lack of egregiousness and minimal scienter)).  "[T]he harsh effects of an SEC injunction demand that it not be imposed lightly or as a matter of course, that it be imposed only upon a meaningful showing of necessity, and when it is imposed, that it be as short and narrow as reasonably possible."  *Id.* at 559.  Because Defendants' misconduct was not egregious and did not involve any scienter, the Court finds that a permanent injunction against future misconduct without a complete penny stock bar "provide[s] full relief without inflicting unnecessary pain."  *Id.* at 560.  The SEC's request for a penny stock bar is therefore denied.

## C.   Disgorgement and Prejudgment Interest

The SEC seeks a disgorgement, together with prejudgment interest, of Defendants' net

---

[10]     Specifically, even after the SEC filed its complaint in *Keener*, the defendant sold additional penny stock through his convertible note business that was the very subject of that litigation and then lied about it.  644 F. Supp. 3d at 1299-1300.  By contrast, Defendants here have not traded in any securities for over six years, nor are Defendants alleged to have made any materially false statements in the course of this litigation.  (*See* ECF No. 56 at 10.)

profits resulting from their convertible note activity while acting as unregistered dealers. Defendants argue that pursuant to the United States Supreme Court's decision in *Liu v. SEC*, 591 U.S. 71 (2020), a disgorgement award is authorized only if the SEC can identify investors who were harmed by their failure to register as brokers.  (ECF No. 56 at 12-13.)

The SEC has not yet identified any victims despite making "an initial determination that a distribution to harmed investors may be feasible."  (ECF No. 55 at 16.)  But it argues that even if it is unable to distribute disgorgement to victims in this case, it may request that such proceeds be distributed to the United States Department of the Treasury.  (*Id.* at 16-17.)  The first question, therefore, is whether the Court may order disgorgement at this stage without identified investors who have been harmed.

The Exchange Act provides for disgorgement in two ways:

> (5) Equitable relief . . . . In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.
>
> . . . .
>
> (7) Disgorgement . . . . In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement.
>
> [15 U.S.C. §§ 78u(d)(5), 78u(d)(7).]

In *Liu*, the Supreme Court held that the SEC could seek the "equitable relief" of disgorgement under § 78u(d)(5) provided that the disgorgement award "does not exceed a wrongdoer's net profits and is awarded for victims."  591 U.S. at 1937.  The Supreme Court reasoned that merely depriving the wrongdoer of ill-gotten gains without distributing the funds to victims would render meaningless the latter part of the provision requiring relief to be "for the

benefit of investors." *Id.* at 1948. But the Supreme Court did not address "what traditional equitable principles govern when, for instance, the wrongdoer's profits cannot practically be disbursed to the victims," and stated that "lower courts may evaluate . . . whether [an order directing disgorgement funds to the Treasury] would indeed be for the benefit of investors as required by § 78u(d)(5) and consistent with equitable principles." *Id.* at 1949-50. As this Court has already explained, "[a]t no point did the Supreme Court, as Defendants suggest, impose upon the SEC new obligations to identify individual victimized investors or to quantify their losses prior to a finding of liability or a disgorgement award." *Fierro*, 2023 WL 4249011, at *10. Moreover, after *Liu*, Congress amended the securities remedies statute by adding subsection (7) to expressly permit orders of disgorgement without the "for the benefit of investors" language in subsection (5). *See SEC v. Spartan Sec. Grp., Ltd.*, 620 F. Supp. 3d 1207, 1223 (M.D. Fla. 2022). Accordingly, this Court has the authority to order disgorgement even though the SEC has not yet identified harmed investors. Even if the SEC is unable to ultimately distribute any disgorgement to victims, "a balancing of the equities favors ordering disgorgement and allowing it to be sent to the Treasury" instead of allowing Defendants to retain profits earned as a result of their failure to register as dealers. *See id.* at 1224-25.

Next, Defendants argue that because their violation of the Exchange Act was "a failure to perform an administrative act," *i.e.*, to register as a securities dealer, the "SEC cannot identify any causal connection between the omission of this administrative act and any ill-gotten profits." (ECF No. 56 at 17.) Put differently, there was nothing illegal about Defendants' actions other than their status as unregistered dealers.

The securities remedies statute states that courts may order disgorgement under § 78u(d)(7) "of any unjust enrichment by the person who received such unjust enrichment as a result of such

violation."  15 U.S.C. § 78u(d)(3)(A)(ii); *see also SEC v. Teo*, 746 F.3d 90, 107 (3d Cir. 2014)

(holding that in civil enforcement actions, the SEC need not prove more than but-for causation

between violations and disgorged profits).  Here, the SEC has proved but-for causation.

Defendants violated § 15(a)(1) by buying and selling securities without registering as a dealer, and

they profited as a result of these transactions.  Thus, the Court may order disgorgement of profits

Defendants illegally earned by trading securities without registering as a dealer.  Defendants

contend that "the SEC has not identified a single aspect of Defendants' convertible note

transactions that would have been different had Defendants registered."  (ECF No. 56 at 17-18.)

Other courts have rejected this same argument because it would "significantly weaken the

enforceability of Section 15(a)(1) . . . [because] an unregistered dealer of securities could retain all

profits from systemic unlawful activity based on the theory that he could have obtained those

profits had he complied with the law."  *Keener*, 644 F. Supp. 3d at 1304.  This Court rejects it for

the same reason.  *See also Almagarby*, 92 F.4th at 1321 ("Almagarby was altogether prohibited

from making transactions as an unregistered dealer, so *any* profits generated from his prohibited

transactions were causally linked to his failure to register." (citing *Teo*, 746 F.3d at 103)).

Finally, to calculate a disgorgement figure, the Third Circuit has established the following

burden-shifting procedure:

> First, the SEC is required to produce evidence supporting a
> reasonable approximation of actual profits on the tainted
> transactions.  Once the SEC has made this showing, the burden
> shifts back to the defendant to demonstrate that the disgorgement
> figure is not a reasonable approximation, with any risk of
> uncertainty fall[ing] on the wrongdoer whose illegal conduct created
> uncertainty.  In evaluating these steps, a District Court may take into
> account facts that were not determined by the jury, but it may not
> base its decision on factual findings that conflict with the jury's
> findings.  As a result, a District Court has wide discretion in deciding
> the amount to be disgorged.

[*SEC v. Bonan Huang*, 684 F. App'x 167, 176 (3d Cir. 2017) (internal citation and quotation omitted).]

Here, the SEC calculates the Defendants' net profits of their unregistered dealer business from January 1, 2015 to November 30, 2017 (the Relevant Period) to be $4,053,148.  (ECF No. 55 at 14.)  In support, the SEC relies on the calculations of Dr. Carmen A. Taveras.  (ECF No. 54-3.)  Dr. Taveras determined that during the Relevant Period, the Defendants' gross sale proceeds of $8,531,625.00, minus the cost of the securities at $3,733,654.00, results in net gains of $4,797,971.00.[11]  (*See* ECF No. 31-15 at 12.)   Dr. Taveras then calculated Defendants' business expenses for the Relevant Period based on business deductions Defendants took in their federal tax returns for each of those years, which amount to $744,823.00.  (ECF No. 54-3 ¶ 6.)  Dr. Taveras subtracted Defendants' business expenses from their gains, resulting in a net profit figure of $4,053,148.00.  (*Id.* ¶ 7; ECF No. 55 at 14.)  The Court finds that Dr. Taveras has established a reasonable approximation of Defendants' net profits resulting from their convertible note activity during the Relevant Period.

Defendants do not challenge Dr. Taveras's calculations or the underlying data but argue that "$1,382,840 out of the $4,053,148 that the SEC proposes for disgorgement" should not be included.  (ECF No. 59 at 9; ECF No. 56 at 13-14.)  They argue that stock amounting to $1,382,840.00 came not from their convertible note investments, but from "private investment in public equity" ("PIPE") deals and from settlement agreements — investments that "have never been the subject of this matter."  (ECF No. 56 at 14.)  But Dr. Taveras's calculations show that the PIPE deals were specifically identified as "activity that was not related to convertible notes" and

---

[11]    The specific data that Dr. Taveras used to reach these figures are summarized at ECF No. 31-15 ¶¶ 6-16.  While Defendants argue that certain data should not have been included (as discussed more fully below), Defendants do not dispute the data underpinning Dr. Taveras's calculations.

were excluded from her calculations of Defendants' net proceeds resulting from their convertible note activity.  (*See* ECF No. 56 at 14; ECF No. 31-15 at 8-11.)  And Defendants' interest in shares that they received through settlement agreements were still acquired as a result of Defendants' unlicensed dealings.  Accordingly, Defendants' shares received through settlement agreements were properly included in the SEC's calculations.  *See Keener*, 644 F. Supp. 3d at 1300 (noting that whether the unregistered dealer acquired stock through discounted note conversion or through a settlement agreement was "a distinction that makes no difference").

For these reasons, Defendants have not demonstrated that the SEC's disgorgement figure is unreasonable.  Nor do Defendants dispute that they should pay disgorgement on a joint and several basis.  *See also Liu*, 591 U.S. at 90-91 (recognizing that collective liability may be appropriate "for partners engaged in concerted wrongdoing" and "equally culpable codefendants").  Accordingly, the Court will order Defendants to pay a disgorgement of $4,053,148.00 on a joint and several basis.[12]

Finally, it is within the Court's "equitable discretion to decide whether payment of interest should be ordered, and to decide upon both the interest rate and the period of time on which the interest will be calculated."  *Teo*, 746 F.3d at 109.  "The award of prejudgment interest, like an award of disgorgement, deprives the [defendants] of their ill-gotten gains and prevents unjust enrichment."  *SEC v. Antar*, 97 F. Supp. 2d 576, 589 (D.N.J. 2000) (quoting *SEC v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 612 (S.D.N.Y. 1993)).  Defendants argue that

---

[12]     The SEC may also file a proposed distribution plan for any identified victims for the Court's approval and will allow Defendants to raise any objections.  The Court need not wait for the SEC's proposed distribution plan before ordering disgorgement, because even if the SEC is unable to ultimately distribute the disgorgement to victims, "a balancing of the equities favors ordering disgorgement and allowing it to be sent to the Treasury" rather than the funds remaining with Defendants.  *See Spartan*, 620 F. Supp. 3d at 1224-25.

prejudgment interest is inappropriate because Defendants did not act with scienter. But Defendants do not cite any authority holding that scienter is required for a court to order prejudgment interest. And "if defendants are not required to pay prejudgment interest on the disgorgement amount, they in effect will have gained the benefits of an 'interest-free' loan throughout the relevant time period." *Antar*, 97 F. Supp. 2d at 589 (citation omitted). Given the goal of preventing unjust enrichment and the lack of any unfairness to Defendants, the Court will award prejudgment interest at a sum of $1,326,440.00, which along with disgorgement totals $5,379,588.00,[13] to be paid by Defendants on a joint and several basis.

### D. Civil Penalties

The SEC asks the Court to order Defendants to each pay a civil penalty of $275,000.00, for a total of approximately 13% of Defendants' ill-gotten gains. (ECF No. 55 at 18.) In determining whether a civil penalty is appropriate, courts must consider "(1) the egregiousness of the violations; (2) the defendant's scienter; (3) the repeated nature of the violations; (4) the defendant's failure to admit to his wrongdoing; (5) whether the defendant's misconduct created substantial losses or the risk of substantial losses to others; and (6) the defendant's lack of cooperation and honesty with authorities." *Johnson*, 2004 WL 5561799, at *5.

The recurrent nature of Defendants' misconduct and a lack of evidence showing that Defendants have admitted wrongdoing or cooperated with the authorities weigh in favor of imposing a civil penalty. But Defendants' misconduct was not egregious, nor did Defendants act with scienter. And the SEC has not provided the Court with evidence that Defendants' conduct led to substantial investor losses. (*See* ECF No. 55 at 19 (arguing that because Defendants "were

---

[13]     Prejudgment interest is calculated using the IRS's rules for calculating interest on the underpayment of taxes. (ECF No. 54-3 ¶ 8.) The Third Circuit has found that the use of this rate to calculate prejudgment interest is reasonable. *See Teo*, 746 F.3d at 109-10.

flooding an unsuspecting market with billions of newly issued shares, it is highly likely that investors suffered substantial losses").)

Congress has, however, recognized the need to "provide a financial disincentive to violations that reflect an unwillingness to incur the cost of full compliance with the securities laws." Securities Law Enforcement Remedies Act of 1990, H.R. Rep. 101-616, *reprinted in* 1990 U.S.C.C.A.N. 1379, 1384 (July 23, 1990).  Multiple courts have recognized that "Section 15(a)'s registration requirement is 'of the utmost importance . . .' because it enables the SEC 'to exercise discipline over those who may engage in the securities business and it establishes necessary standards with respect to training, experience, and records." *SEC v. Benger*, 697 F. Supp. 2d 932, 944 (N.D. Ill. 2010) (quoting *Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001)).  And here, although Defendants did not act with scienter, such a factor is not dispositive, as the first tier of the securities remedies statute allows for civil penalties for violations that do not require scienter.  15 U.S.C. § 78u(d)(3)(B)(i).  Therefore, the recurrent nature of Defendants' violations, the lack of acknowledgment of wrongdoing or cooperation with authorities, and the need for deterrence weigh in favor of imposing a civil penalty.  *Desai*, 145 F. Supp. 3d at 338 ("[A] civil penalty is intended to both punish and serve as a deterrent mechanism.").  Indeed, "[w]ithout civil penalties, the only financial risk to violators is forfeiture of their ill-gotten gains." *SEC v. Koenig*, 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007).  Because Fierro is the sole owner and operator of JDF, the Court finds that a civil penalty of $500,000.00 on a joint and several basis is sufficient to "both punish and serve as a deterrent mechanism." *Desai*, 145 F. Supp. 3d at 338. *See also Almagarby*, 2022 WL 832279, at *1 (holding the defendants joint and severally liable for a civil penalty).  This penalty falls well within the amount the Court may impose under the lowest penalty tier for non-scienter-based violations. *See* 15 U.S.C. § 78u(d)(3)(B)(i) (allowing a penalty

up to the amount of Defendants' gross pecuniary gain). Additionally, the Court is satisfied that a penalty of $500,000.00 "is proportionally comparable to penalties in other unregistered dealer cases." (*See* ECF No. 55 at 21 (collecting cases).) *See also Keener*, 644 F. Supp. 3d at 1303-07 (imposing a penalty of $1,030,000 and a disgorgement of $7,786,639); *Almagarby*, 2022 WL 832279, at *1 (ordering a penalty of $80,000 and a disgorgement of $885,000).[14]

### E. Defendants Shall Surrender for Cancellation any Remaining Shares and Conversion Rights at Issue in this Matter

Finally, because Defendants are willing to surrender and cancel any remaining shares and conversion rights in the companies listed in Exhibit 1 to the SEC's Motion (ECF No. 54-2), the Court will include such relief in its Final Judgment. (*See* ECF No. 56 at 20-21.) *See also Keener*, 644 F. Supp. 3d at 1309 (ordering the unregistered defendant to surrender and cancel remaining shares and conversion rights).[15]

### III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion (ECF No. 55) is **GRANTED** in part and **DENIED** in part. An appropriate Order follows.

Dated: May 21, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

---

[14] Because the SEC intends to distribute the disgorgement and prejudgment interest to harmed investors, the Court will allow the SEC to establish a Fair Fund under Section 308(a) of the Sarbanes Oxley Act of 2002, 15 U.S.C. § 7246 so that the penalty may be added to and become part of the disgorgement fund.

[15] Defendants object to an order requiring them to provide copies of correspondence evidencing their surrender because several of the companies have gone out of business, and such notice is therefore "not possible." (ECF No. 56 at 20-21.) Defendants need only attempt to notify the issuer and then advise the SEC if their attempt is unsuccessful because the issuer is out of business. *See also Keener*, 644 F. Supp. 3d at 1309 (requiring the defendant to "send copies of correspondence evidencing the surrender" to the SEC).

17